**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: January 07 2011

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 10-32324 |
| | ) | |
| Budd Allen Martin and | ) | Chapter 12 |
| Cherry Linn Martin, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION REGARDING MOTION FOR RELIEF FROM STAY

This case is before the court on the Motion for Relief from Stay and Abandonment ("Motion") [Doc. # 22] filed by the Citizens Banking Company ("Movant") and Debtors' objection [Doc. # 28]. Movant seeks an order conditioning, modifying or terminating the automatic stay imposed by 11 U.S.C. § 362 with respect to certain personal property, consisting of farm machinery and three sheep, and real property located at 5297 Bullhead Road, Willard, Ohio. The Motion also seeks abandonment of both the personal property and the real property pursuant to 11 U.S.C. § 554.

The court held a final evidentiary hearing, at which the parties presented testimony and other evidence in support of their respective positions. At the hearing, the parties represented that they had reached an agreement with respect to all of the farm machinery at issue, which agreement is to be memorialized by a separate order submitted by Debtors. Also, to the extent that the Motion requests relief from the automatic stay with respect to Debtors' sheep, the court considers such request abandoned, as

Movant offered no evidence or argument relating to such relief at the hearing. This memorandum of decision and order, therefore, addresses the Motion only as it relates to the real property.

Having considered the Motion, the testimony and other evidence admitted at the hearing, as well as the arguments of counsel, to the extent it relates to the real property, the court will grant the Motion insofar as it will condition the continuation of the automatic stay but will deny abandonment of the real property. To the extent it relates to Debtor's sheep, the court will deny the Motion.

## FACTS

Debtor Budd Martin ("Debtor") purchased the 74.67-acre farm consisting of the real property at issue in 1973 ("the Property"). Since that time he has used the premises primarily as a sheep farm. In October and November 2006, quarantine orders were issued by the Ohio Department of Agriculture due to positive test results indicating that Debtor's flock of sheep could have been exposed to scrapie, a fatal, degenerative disease affecting the central nervous system of sheep and goats. [Debtor's Exs. A & B]. There is no treatment for the disease, the symptoms of which appear within four to six years after exposure, and the disease is transmitted through contact with any "lambing" areas, that is, areas where sheep have given birth. With the exception of three sheep that Debtor requested to keep,[1] his entire flock of approximately 1100 sheep were removed from the premises by the United States Department of Agriculture in an attempt to control the spread of the disease.[2] Although Debtor has completed the required process for cleaning the premises, which involves removal of organic debris and disinfecting all lambing areas, because three sheep were retained by Debtor, a third quarantine order was issued on January 2, 2008. [Debtor's Ex. C]. Unlike the first two quarantine orders, the third order describes as being quarantined not only the animals but also the Property. [Debtor's Ex. C]. It is Debtor's understanding that the sheep are quarantined until they die and that the Property is quarantined for five years, which will expire in December 2013.[3]

---

[1] Debtor requested that he be allowed to keep three particular sheep because they came from expensive blood lines. His request was granted.

[2] According to Debtor, the sheep were tested after being slaughtered and none tested positive for scrapie.

[3] Under "Terms for Release of Quarantine," the third quarantine order refers to the Post Exposure Monitoring and Management Plan Agreement ("PEMMP plan") signed on December 13, 2007. The PEMMP plan requires Debtor to maintain certain records regarding his sheep and to make them available for inspection, to report certain symptoms if observed in the sheep, and to move the sheep only in accordance with the federal regulations. The PEMMP plan provides that "[t]his plan will be deemed satisfactorily completed when all requirements have been met for five years after the date of signature or five years after the last test positive animal is removed, whichever is longer" but notes that "the quarantine will remain in effect for the retained . . . animals until they die and they are not subject to release at the completion of the PEMMP plan." [Debtor's Ex. E, p. 3]. It does not, however, refer to the Property except perhaps in restricting the movement of the animals.

Until the quarantine was ordered in 2006, Debtor was current in making payments on debt owed to Movant. However, after the quarantine, he was unable to pay on his loans and, in the Fall of 2008, his debt owed to Movant was restructured. Under the restructuring, Debtor executed two promissory notes in favor of Movant in September 2008 in the amounts of $360,000, amortized over twenty years, and $10,000, amortized over seven years, both of which are secured by mortgages on the Property as well as a perfected security interest in all of Debtor's livestock, farm machinery and tools. [Creditor's Exs. 1 & 2]. Both of these promissory notes required annual payments beginning April 30, 2009. Debtor also executed a promissory note in favor of Movant in October 2008 in the amount of $15,000 that matured on April 13, 2009, and which is secured by a perfected security interest in all of Debtor's livestock and farm equipment. The amount due on the two September 2008 promissory notes totals $430,438.23 as of October 18, 2010. And the amount due on the October 2008 promissory note totals $11,679.34.

In order to obtain the September 2008 loans, both of which have a 90% guaranty from the Farm Service Agency, Debtor provided a cash flow statement prepared by him with the help of Movant's loan officer. The statement showed a cash flow of approximately $50,000 and was based on an assumption that Debtor would feed and sell 2000 lambs per year. It also assumed that Debtor would go into the hay business since his farm was not suitable for growing crops. To operate a hay business, Debtor would buy fields of hay, harvest it and store it until it is sold in January or February of the following year. This required a barn to be built for storing the hay. Although Debtor had the barn built in the Spring of 2009 at a cost of approximately $20,000, he did not receive the expected financing from Movant to do so. He also did not receive the operating loan that was necessary to conduct both his sheep and hay business that he assumed he would receive from Movant. Thus, the assumptions upon which the cash flow statement was based did not occur. Debtor has made no payments to Movant since his debt was restructured and has not paid property taxes on the Property since 2008.

Debtor sold no sheep during 2007 and 2008. During that time he worked on a neighbor's farm earning $10 per hour. However, in 2009, Debtor entered into an agreement with United Producers where United Producers purchased 700 lambs that were then fed and eventually sold by Debtor. After repaying United Producers the purchase price plus six percent, Debtor earned approximately $14,000. Although United Producers is no longer providing such financial assistance, Debtor's neighbor is currently providing the same business arrangement. The neighbor purchased 500 sheep that Debtor feeds on Debtor's farm and will eventually be sold by Debtor. According to Debtor, he has no feed costs as his neighbor, who has a large grain farm, gives him free of charge the byproduct from corn raised on the farm, which Debtor then

3

uses to feed the sheep. The "feed and sell" process has not been completed for 2010 and Debtor does not expect it to be completed before the end of the year as 200 of the sheep are breeding ewes that will not be sold until May 2011.[4]

In 2010, Debtor began farming beans and corn on approximately 200 acres of land, only a small portion of which is farmed on the Property. Debtor pays cash rent to farm 176 acres on three other farms. He testified that the bean and corn market is good and estimates that this will net approximately $100 per acre or $20,000. At the time of the hearing on the Motion, Debtor had not yet harvested sixty-five acres of corn. In 2010, Debtor also purchased 76 acres of hay that he is now in the process of harvesting. The hay will be stored by Debtor and sold during January and February 2011. Debtor estimates that his profit will be approximately one-half of the selling price of the hay.

In addition to the lambing, farming and hay businesses described above, Debtor earns between $5,000 and $6,000 per year judging livestock shows, which he has done for approximately thirty years. Debtor Charry Martin also has stable "off-farm" employment that covers their monthly basic household living expenses.

Debtors filed for relief under Chapter 12 of the Bankruptcy Code on April 8, 2010. Their bankruptcy schedules show secured debt in an amount of $407,910 and unsecured debt in the amount of $7,760. Debtor testified that their petition was filed primarily for the purpose of dealing with the debt owed to Movant. Debtors' monthly operating reports filed in this case for the months of April through September 2010 show total income for that time period after household and farm expenses of $5,885. [*See* Creditor's Exs. 11, 12 & 13; Doc. ## 16 & 65]. Although a Chapter 12 plan has not yet been filed in this case, Debtor testified that a confirmable plan can be proposed that includes a $20,000 per year payment to Movant, which he states he is prepared to pay now, and amortization over twenty years of Movant's allowed secured claim, which Debtor asserts is $190,000. Debtor's assertion puts in issue the fair market value of the Property that secures Movant's claim. Debtor concedes that he cannot propose a confirmable plan if the Property's fair market value is $336,000 as asserted by Movant, and Movant represents that it will not consent to a plan that does not provide for full payment of its allowed secured claim. Thus, both parties offered expert testimony as to the value of the Property.

Movant offered the expert testimony of Edward Lauby, a certified real estate appraiser and former chief appraiser in Ohio for the Farm Service Agency. Lauby completed his appraisal in February 2010. His

---

[4] Debtor explained that the quarantine to sell has been lifted regarding animals genetically resistant to scrapie, which apparently applies to all of the sheep on his farm except the three quarantined sheep.

4

appraisal included, among other things, reviewing the Huron County Auditor's report, which reflects a total value of the Property of $255,800 [Creditor's Ex. 4, p. 47], walking through Debtors' home, walking around the buildings on the Property, and driving around the farm. Pictures included with the appraisal show the Property covered with snow at the time. Using a comparable sales approach, which he believed to be the most appropriate approach, Lauby opined that the Property has a fair market value of $336,000, or approximately $4,500 per acre. He testified that his appraisal is based on his opinion that the highest and best use of the Property is use as farmland and, in particular, that the typical buyer would be a grain farmer. According to Lauby, the Farm Service Agency records show that the soil on the Property has a high productivity rating. However, he did not review any records showing what crops have been raised on the Property over the past twenty years and he has no knowledge of such. Lauby testified that he considered the productivity rating because that is what a typical buyer will consider. Lauby's appraisal is also based on his opinion that the scrapie disease issue that Debtor has dealt with does not impair the value of the Property. His opinion is based on telephone calls to several persons in the United States Department of Agriculture and a person in the Ohio Department of Agriculture who told him that the necessary clean-up and disinfection of the Property was completed several years ago and that the Property is under no current restriction. However, Lauby did not recall seeing the last quarantine order dated January 2, 2008, indicating that the Property was quarantined, and that document was not otherwise referred to, or provided to him, by the individuals that he spoke to at the federal and state departments of agriculture. According to Debtor, if one of his three quarantined sheep remaining on the Property tests positive for scrapie, the Property would have to be cleaned and disinfected once again. Nevertheless, Lauby testified that if a buyer would be required to clean up and disinfect the Property, it would have no effect on the value of the property. But in his written appraisal, Lauby states that Debtor has advised his neighbors and others that his farm is under quarantine and that "this could have a huge impact on the price obtained from this property at any type of auction or sell [sic] of the farm." [Creditor's Ex. 4, p. 9].

      In support of his assertion of value of the Property, Debtor offered the expert testimony of a real estate agent/broker and auctioneer, Ned Gregg. Gregg has worked as a real estate agent and auctioneer for sixty years. He testified that he is "very familiar" with farm values in Huron County, Ohio, where the Property is located, as he has been involved in appraisals and sales of real estate, including farms, in Huron County for forty years. Gregg appraised the Property in late September 2010. In addition to reviewing the Huron County Auditor's report, he visited the Property, viewed the buildings on the Property and walked through the different areas of the Property. He testified that the Property does not have enough tillable acres

5

to give anyone the incentive to buy it as a grain farm and the location of the tillable acres at the "back end" of the Property makes it difficult, if not impossible, to get a combine and other large farming equipment into that area. In addition to approximately 16 acres of woodland, he testified that there are approximately 11 acres of wasteland that is very wet and that the 35 to 40 acres of cropland has "soggy soil" but is a good grassland.

Although Gregg testified that $4,500 per acre is a fair value for a grain farm, he opined that the Property is simply not a grain farm. According to Gregg, the Property has a fair market value of $190,312 based on his opinion that, for the reasons set forth above, the highest and best use of the Property is as a livestock farm. Bluntly and persuasively characterizing the Property as "not a real good farm," Gregg's appraisal is also based on the poor condition of the buildings on the Property. However, he did not include in his appraisal the value of the new hay barn built in 2009, which he estimates would increase his appraisal total by approximately $21,000 (estimating 2100 square feet at $10 per square foot). Gregg also testified that given the serious nature of the scrapie disease, even if the state agency now says there is no quarantine as to the Property, the fear associated with the fact that there was a quarantine will affect the Property's value. Gregg testified, however, that if the Property had no quarantine and was "fresh," its value would increase by approximately $500 to $1,000 per acre.

For all of the reasons explained by him at the hearing as set forth above, the court finds Gregg's testimony regarding the highest and best use of the Property as a livestock farm persuasive and does not find valuation based on use of the Property as a grain farm appropriate. Gregg's testimony is also consistent with the use of the Property for at least the past twenty-seven years. Although Gregg values the Property at $190,312 based on such use, in determining the Property's fair market value, the court has also considered the effect of any quarantine relating to the Property. It is unclear whether the quarantine in place applies only to the three sheep retained by Debtor or applies also to the Property itself. *See* Ohio Rev. Code § 941.07 (providing that "[a] quarantine order shall remain in effect until a written notice of release is issued by the department of agriculture, or until ordered to be removed after a hearing. . . ."). Lauby's appraisal is based, in part, on discussions with personnel at both the federal and state departments of agriculture indicating that the Property is not quarantined and any type of animals can be brought onto the farm. He, therefore, did not discount the fair market value of the Property on account of a quarantine. This is perhaps supported by evidence that Debtor completed the required clean up and disinfection of the Property several years ago and that the quarantine does not affect Debtor's ongoing lambing business or his ability to farm a small portion of the Property. Nevertheless, the January 2, 2008, quarantine order, which is presumably

6

of record with the Ohio Department of Agriculture, appears on its face to quarantine both the sheep and the Property. That quarantine order was not addressed by the agencies' personnel or by Lauby in his appraisal, as he was unaware of the order.

The court does not believe that conducting a livestock business on the Property at this time is affected by the quarantine, and, thus, finds that Gregg's appraisal should be adjusted accordingly. Nevertheless, the court credits Debtor's testimony that if his three quarantined sheep ever test positive for scrapie, clean up and disinfection of the Property will again be required. In light of this unknown factor, together with Gregg's credible testimony regarding the fear (rational or otherwise and stoked pre-petition to some extent by Debtor himself) associated with a previous quarantine due to the scrapie disease, the court finds that an upward adjustment to Gregg's appraisal should be made at the low end of the range to which he testified is appropriate if there was no quarantine on the Property itself. Thus, the court finds that Gregg's appraisal of $190,312 should be increased by $500 per acre, or $37,335 ($500 x 74.67 acres).

The court also finds that Gregg's appraisal must be adjusted upward by $21,000 to include the value of the hay barn built in 2009. As a result, the court finds that the fair market value of the Property is $248,647.

## **LAW AND ANALYSIS**

Relief from the automatic stay is governed by 11 U.S.C. § 362(d) which, in pertinent part, provides as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>     (A) the debtor does not have an equity in such property; and
>     (B) such property is not necessary to an effective reorganization.

Movant asserts § 362(d)(1) and (d)(2) as alternative grounds for relief.

Congress set forth burdens of proof applicable to a motion for relief from stay in 11 U.S.C. § 362(g). Specifically, the party seeking relief has the burden of proof on the debtor's equity in property, and the party opposing relief has the burden of proof on all other issues. Notwithstanding these statutory burdens, a party seeking relief from stay still has the burden of going forward to establish a prima facie right to the relief

requested before the burden shifts to the debtor to disprove that cause exists for relief from stay. *In re Bushee*, 319, B.R. 542, 551 (Bankr. E.D. Tenn. 2004); *In re Cambridge Woodbridge Apts., L.L.C.*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003). In the context of secured creditors, this initial burden of going forward requires the movant to establish (1) the amount of the debt owing to the movant by the debtor, (2) that the movant holds a perfected security interest in property of the estate, and (3) a showing of the right to relief it seeks under either § 362(d)(1) or (d)(2). *In re Planned Systems, Inc.*, 78 B.R. 852, 860 (Bankr. S.D. Ohio 1987); *In re Elmira Litho, Inc.*, 174 B.R. 892, 900-902 (Bankr. S.D.N.Y. 1994).

The undisputed evidence shows that the amount of the debt owed to Movant with respect to the September 2008 promissory notes as of October 18, 2010, was $430,438.23 and that this debt is secured by mortgages on the Property that show that they were recorded at the Huron County Recorder's Office on October 1, 2008. Movant has also shown a prima facie right to relief under both § 362(d)(1) and (d)(2) as to the Property.

**I. Right to Relief Under 11 U.S.C. § 362(d)(1)**

Movant asserts as cause under § 362(d)(1) that it lacks adequate protection of its mortgage interest in the Property due to Debtor's failure to make payments since 2008. A creditor's "interest in property" to be protected under § 362(d)(1) is "the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization. . . ." *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 370 (1988). Thus, "if the secured property is declining in value or if there is an impairment of the secured creditor's interest, then the creditor is entitled to adequate protection." *In re Poissant*, 405 B.R. 267, 272 (Bankr. N.D. Ohio 2009).

In this case, it is undisputed under any valuation of the Property presented that Movant is an undersecured creditor. However, Debtor's failure to make any payments on the debt owed to Movant since 2008 does not, without more, demonstrate a lack of adequate protection of its interest in the Property. *See Timber of Inwood Forest Assoc.*, 484 U.S. at 381 (holding that undersecured creditors are not entitled to compensation for lost opportunity cost during a Chapter 11 case). There is no evidence indicating that the Property is declining in value. *Cf.* 11 U.S.C. § 1205(b)(1). Nevertheless, the evidence does show that Debtors have not paid their real property taxes since 2008. Under Ohio law, delinquent property taxes result in a first lien on the property in favor of the state. *See* Ohio Rev. Code §§ 323.11 and 5721.10. In light of Movant's undersecured position, the court finds that Debtors' failure to pay the post-petition real property taxes has impaired Movant's interest in the Property and, therefore, that Movant has established a prima facie right to relief under § 362(d)(1). Although Debtors contend that they will be able to propose a

confirmable plan, which presumably will address the property tax delinquency, no plan has yet been filed. Debtors have not met their burden of proving that Movant's interest in the Property is adequately protected. The court, therefore, finds that Movant is entitled to relief from the automatic stay under § 362(d)(1).

## II. Right to Relief Under 11 U.S.C. § 362(d)(2)

The court also finds that Movant is entitled to relief under § 362(d)(2). As discussed above, the undisputed evidence shows that Movant is an undersecured creditor. Once Debtors' lack of equity has been shown, it was incumbent upon them to show that the Property is necessary to an effective reorganization. *See* 11 § 362(d)(2)(B). In order to meet their burden, "debtor[s] must prove that the property is important to the reorganization and that the planned reorganization is feasible." *In re Cambridge Woodbridge Apts., L.L.C.,* 292 B.R. at 840 (citing *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 376). "A planned reorganization is feasible when there is 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* (quoting *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 376).

In this case, Debtors' sources of income to fund a reorganization plan include, among other things, income from Debtor's lambing business and hay business. There is no dispute that the Property is important to the success of those business endeavors. Without the Property, Debtor would be unable to feed the sheep and store the hay harvested in the fall and sold during the winter months. However, Debtors have not met their burden of showing that a planned reorganization is feasible. No Chapter 12 plan has yet been filed. Movant has made clear that it will not consent to a plan that does not provide for full payment of its allowed secured claim. The debt owing to Movant being the primary debt that must be addressed, Debtor testified that he is able to propose a plan that provides for payment of Movant's allowed secured claim, amortized over twenty years, by paying Movant $20,000 per year and that he has $20,000 that can be immediately applied to fund a plan payment. However, the monthly operating reports filed in this case covering approximately a six-month period show income of only $5,885 after payment of household and farm expenses. This income does not support a finding that a plan requiring a $20,000 annual payment over twenty years is feasible. As such, Debtor's have not met their burden of showing a reasonable possibility of a successful reorganization within a reasonable time, and Movant is, therefore, also entitled to relief under § 362(d)(2).

## III. Relief Under § 362(d)

Given the circumstances described above, § 362(d) mandates that the court grant relief from the automatic stay, with the court retaining the discretion to fashion the appropriate relief. *Condor One v. Archway Apartments, Ltd. (In re Archway Apartments, Ltd.)*, 206 B.R. 463, 465 (Bankr. M.D. Tenn. 1997).

The statute provides in the alternative that relief may include "terminating, annulling, modifying, or conditioning such stay." 11 U.S.C. § 362(d).

While Debtors' monthly operating reports since filing their petition in April 2010 do not show sufficient income to fund a Chapter 12 plan, the court recognizes that Debtor's businesses do not lend themselves to a regular monthly income but, rather, are seasonal. The promissory notes executed by Debtor in favor of Movant acknowledge this reality in that they call for annual, rather than monthly, payments to be made. Debtor is just now in the process of harvesting the hay he has purchased, the sale of which will not occur until January or February, and, at the time of the hearing, he had not yet harvested sixty-five acres of corn. In addition, he will not complete the current "feed and sell" cycle of his lambing business until May 2011. Because it has only been during the past year that Debtor has been able to put in place the multiple means to generate the income to overcome the scrapie setback and that he believes will be sufficient to fund a plan that will adequately address Movant's allowed secured claim, and because the next few months will be a better indicator of Debtor's ability to generate such income than the monthly operating reports filed through the hearing date, the court finds terminating the automatic stay at this juncture is not the appropriate form of relief on the Motion.

The court will instead condition the continuance of the automatic stay. In order to provide Movant adequate protection of its interest in the Property, the court will require Debtor to apply a portion of the $20,000 that he has available to apply to a Chapter 12 plan to pay all property taxes that have already become due post-petition and timely pay all property taxes that become due going forward. *See* 11 U.S.C. § 1205(b)(4). The court will also require Debtor to deposit the balance of the $20,000, which is property of the estate, 11 U.S.C. § 1207(a), in his attorney's IOLTA account, which amount shall be available to fund, at least in part, a Chapter 12 plan to the extent one is confirmed. Debtor shall file with the court evidence that the real property taxes have been paid and the required funds deposited in the IOLTA account. Finally, Debtors shall file a proposed Chapter 12 plan on or before May 16, 2011.

The court will enter a separate order in accordance with this Memorandum of Decision.